CENTRAL FREIGHT LINES, Inc., et al., Plaintiffs,

v.

UNITED STATES of America, The Interstate Commerce Commission and Coordinate Transportation Company, Defendants,

Missouri-Kansas & Texas Railroad Company and Missouri-Kansas & Texas Railroad Company of Texas, Intervenors.

Civ. A. No. 1642.

United States District Court
W. D. Texas,
Waco Division.

May 29, 1956.

Herbert L. Smith, Austin, Tex., Carl B. Callaway, Dallas, Tex., for plaintiff Central Freight Lines, Inc.

Clarence D. Todd, Charles W. Singer, Washington, D. C., Dan Moody, Austin, Tex., Todd & Dillon, Washington, D. C., of counsel, for plaintiff Coordinated Transp. Co.

Leo H. Pou, Associate Gen. Counsel, I.C.C., Washington, D. C., Robert W. Ginnane, Gen. Counsel, I.C.C., Washington, D. C., of counsel, for defendant Interstate Commerce Commission.

Stanley N. Barnes, Asst. Atty. Gen., James E. Kilday, Willard R. Memler, Sp. Assts. to the Atty. Gen., Russell B. Wine, U. S. Atty., San Antonio, Tex., for defendant United States.

W. R. Howell, St. Louis, Mo., M. E. Clinton, G. H. Penland, Dallas, Tex., Vinson, Elkins, Weems & Searls, C. E. Bryson, Houston, Tex., Dan Moody, Austin, Tex., for intervenors M. K. & T. R. Co. and M. K. & T. R. Co. of Tex.

Before HUTCHESON, Circuit Judge, and RICE and CONNALLY, District Judges.

HUTCHESON, Circuit Judge.

Complaining of an order of the Interstate Commerce Commission in "No. MC-105146 (Sub. 4) Columbia Motor Transport Extension-Texas," granting defendant, Coordinated Transportation Company, a motor carrier, a certificate of convenience and necessity in interstate and foreign commerce, plaintiffs, owners and holders of certificates of convenience and necessity authorizing them to operate in such commerce, are here seeking to enjoin, set aside, annul, and suspend it.

The order complained of granted to defendant carrier a certificate of convenience and necessity authorizing operation in interstate and foreign commerce, between thirteen cities and towns and an additional 138 way stations and smaller cities and towns in Texas, as a common carrier by motor vehicle of general commodities, excepting commodities in bulk, commodities requiring special equipment, livestock and household goods, as defined in Practices of Motor Common Carriers of Household Goods, 17 M.C.C. 467, in service auxiliary to, or supplemental of, rail service of the Missouri-Kansas-Texas Railroad Company and its subsidiary, Missouri-Kansas-Texas Railroad Company of Texas, subject to the conditions set forth therein.

Attacking the order as unreasonable, arbitrary, capricious, unjust and unlawful as to plaintiffs, an abuse by the Commission of discretion, and a transcendence of its statutory power and authority, plaintiffs insist that the order was unlawful and void because "The Interstate Commerce Commission was and is wholly without statutory authority to authorize and issue (a) the type and kind of certificate authorized and issued by it to the defendant carrier in this case, (b) a certificate authorizing operations as a common carrier restricted and conditioned as is the certificate involved in this case, or (c) a certificate purporting to be a certificate authorizing operations as a common carrier, and restricted and conditioned as was the certificate issued in this case," and, in the alternative, the Commission was without statutory authority to authorize and issue a certificate of convenience and necessity of the type involved in this case except to the railroad carrier or its subsidiary.

Urging upon us that the undisputed evidence shows that some one or more of the plaintiffs serve all of the states and towns and the 138 points set out in the report and order, and have served said points for many years, and that for a long period of time the defendant, the

railroad company, has practically abandoned the transportation of freight in less than carload quantities to these stations, plaintiffs insist that the service authorized by the order is an entirely new service to these points and the service to be rendered by the defendant carrier will be in competition with the service now rendered by plaintiffs. So arguing, they point to the fact that for more than fifteen years after the passage of the Federal Motors Carriers Act, the railroad company has delayed its effort to institute a coordinated service, and since 1945 the plaintiffs have increased their investments and assumed heavy obligations in large sums of money, believing and relying upon the belief that the railroad company was not interested in less than carload lot traffic, and that, because of the laches of the railroad and plaintiffs' reliance thereon, the order was wrongly issued.

Insisting that the Commission failed to give due consideration to this fact, plaintiffs urge that the fact is decisive and the order is therefore void. Complaining vigorously that the finding of the Commission, that the operating authority granted will not be directly competitive with the service of plaintiffs or unduly prejudicial to them, is without support in, is indeed contrary to, the evidence, plaintiffs insist that, on this record, this and its other findings emphasize that the Commission did not give due effect to the evidence.

Agreeing with the finding that the order will increase the effective service of the railroad, they claim that this finding is inconsistent with other findings, that the proposed operation would not constitute a new service and it would not be unduly prejudicial to the plaintiffs or unduly affect the ability of existing carriers to operate.

A further claim urgently pressed is that the uncontroverted evidence established that the service of the existing motor carriers between the persons and places involved was adequate to the needs of the public, and the order of the Commission shows on its face: (a) that the

Commission did not properly take this evidence into consideration; (b) that it acted arbitrarily and capriciously in the manner in which it considered and disposed of this evidence; and (c) that in granting the certificate here involved, notwithstanding such evidence, the Commission clearly and unlawfully abused its discretion in that (1) the order is not consistent with former orders of the Commission in similar cases, (2) there was no substantial evidence before the Commission to support the order, (3) the finding that public convenience and necessity require its granting is without supporting evidence, and (4) that the finding of the Commission that the carrier is fit and able to perform the service is without support.

In vigorous support of these contentions, plaintiffs, in a well prepared and thoughtfully presented brief documented to the record by quotations from and references to it, thus point up their attack on the Commission's findings and order:

"The adequacy of existing independent motor service on interstate shipments to and from the Texas points involved, was not seriously questioned or challenged by applicant or by the Commission. *Applicant throughout the proceeding placed its whole reliance upon a theory of public convenience and necessity involving no proof of inadequacy of existing independent motor carrier service* such as is required in the usual or traditional case, and the Commission was persuaded (erroneously plaintiffs believe) to apply applicant's theory to the facts in this record. This position of applicant and the Commission is acknowledged by the Commission's statement at page 37 of its report that actually the instant application, the same as most substituted motor for rail cases, is not founded upon a theory that there is a material deficiency in the service proposed, by the existing motor carriers."

Basing their case in great part upon this statement of the position of applicant and Commission, plaintiffs make a frontal attack upon the theory, the report, and the order, insisting that the record does not bear it out in that it shows that the railroad does a very small business in less than carload lots between the points named in the order, indeed that the total amount of traffic to and from many of the points is so insignificant that the railroad now maintains no agent, no telephone or telegraph, and no pick up and delivery service in connection therewith; that conditions are such that even before the issuance of this certificate the motor carriers have found it difficult to maintain their service; and that it necessarily follows that the only source from which the railroad and the applicant can get any new traffic is to take it from the existing carriers. It urges further that what the Commission is really trying to do under the pretense of improving the existing service of the railroad, is to institute a new service which, while in name auxiliary to the railroad service, is, in fact, the institution of new and active motor carrier competition in an area and among communities already fully and adequately served. Standing firmly on these contentions, plaintiffs insist that upon the undisputed facts the whole purpose of the proposed operation is to make the *interstate service of the Katy Railroad competitive in a field where during the past 25 years this railroad has ceased to compete seriously.*

Further stepping up the attack, plaintiffs particularly direct the attention of the court to the real nature and scope of the application involved in this case and the real prize which the railroad is seeking to secure through granting of the application. Alleging that, since the passage of the Motor Carrier Act, the railroad has sat idly by, making no attempt to handle interstate traffic by truck within the state of Texas, while the independent truck lines rendering efficient service by the improvement of their facilities and expenditure of vast sums of money, have created and were handling from and to points in Texas within an area served by the railroad a very substantial volume of interstate traffic, they charge that the purpose of the application was to take away from the truck lines as much as possible of that tonnage and place it back on the rails.

Declaring that they do not take issue with the past general holdings of the Commission or the courts, with reference to the circumstances under which, or the extent to which, the Commission is justified in granting to a railroad the authority to conduct truck operations supplemental to and coordinated with the rail operations of that railroad, they thus state their position:

"Our position is simply that under the undisputed facts of this particular case the orders of the Commission here involved are not based on supporting fact findings but upon either a misapprehension of, or failure to exercise an informed discretion in the application of the law to the facts, and being thus rendered arbitrary, capricious and without legal basis, must be set aside."

Finally, plaintiffs insist: that the report of the Commission, when read in its entirety, indicates, if it does not in fact actually state, that the findings and order of the Commission would have been different had the Commission believed and found that the effect on existing motor carriers of the granting of the application would have been substantial and adverse; and that, under the undisputed facts in this case, if the Commission had given them their proper weight and effect, the Commission would have been compelled to find that the granting of the application would have greatly serious and prejudicial effects.

The Commission and the defendant carrier vigorously oppose these contentions and, in carefully prepared briefs, urge upon us that under the rule obtaining for the review of such orders the record amply supports the findings of the commission and its order may not be disturbed.

Both Commission and carrier citing the many cases which condition and control the consideration by the courts of complaints of this kind, put forward four contentions as sustaining the Commission's action, and insist that each of them is fully supported in law and in fact.

These contentions are (1) that the Commission has statutory authority to issue a certificate of the type here involved to a motor carrier which is not a subsidiary of the railroad but has only a contractual relation with it; (2) that there is substantial evidence to support the Commission's finding that the service proposed to be rendered by Coordinated would not be a new service and would not be directly competitive with the plaintiffs' service or unduly prejudicial to the plaintiffs in their operations; (3) that there is substantial evidence to support the finding that Coordinated was fit to perform the service; and (4) that there is a rational basis for the finding and conclusion that the present and future public convenience and necessity required the proposed operation.

Discussing these issues in detail Commission and Coordinated cite the usual authorities in support of the general proposition that the Commission's order may not be set aside by the court on review if it is supported by substantial evidence, even though the court may consider the Commission's conclusions contrary to the weight of the evidence or may not agree with them. In addition they cite authorities consisting of a long line of Commission cases and the opinion of the Supreme Court in I.C.C. v. Parker, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051, which have established the doctrine that motor carrier service may be used as auxiliary to or supplemental of rail service, and that it is not necessary that the carrier to whom a certificate is issued should be a subsidiary of the railroad.

When it comes to the really crucial findings in the case so vigorously attacked by the plaintiffs, that the service would not be a new service and that it would not, within the meaning of the decisions, be directly competitive with the plaintiffs' service or unduly prejudicial to their operations, Commission and Coordinated point to the restrictions in the certificate and to the facts, as to the public convenience and necessity of the service to be performed, which induced its granting. So pointing they argue with vigor and conviction that this is not the ordinary case of a motor carrier seeking to enter into general competition with other carriers already in the field by instituting new motor carrier service; that the certificate is, within the teachings of I.C.C. v. Parker, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051, in fact and in law for a service auxiliary to existing railroad service; and that as such it is not, and it was correctly found not to be, a new service, nor one unduly prejudicial to plaintiffs and, therefore, the thrust of plaintiffs' attack must fail in the light of the record supporting the Commission's findings and of the principles governing their review.

A study of the case, in the light of the more than forty pages of the detailed and thoroughly documented report of the Commission with its carefully reasoned findings and conclusions, leaves us in no doubt that they were made and the order entered not casually or carelessly but only after and upon a study and consideration of the record as a whole, and that, in considering the contentions and counter-contentions and appraising the arguments and counter-arguments, we must accord to the findings and conclusions not only the presumptions and weight usually accorded to them but the additional weight to which the painstaking care and craftsmanship exhibited in the report entitles it.

Examined in this light, we are of the clear opinion that unless the plaintiffs are right in their contention that because of the railroad's delay in seeking to improve its service and the falling away of its less than carload business, with the result of leading plaintiffs to enter the field has made it unjust and unreasonable for the carrier now to seek to get back what it has in effect conceded to the truck service, plaintiffs have made out a case for relief.

Upon this point, Coordinated's brief, quoting the conclusion of the Commission,[1] urges upon us that the attempt to draw an analogy between the service provided by the Katy Railroad at the Texas points here under consideration and the acquisition of dormant operating rights is certainly a strained one. As the Commission has found, upon a record fully supporting the finding, the Katy Railroad was serving many of the points daily and all of the points at least tri-weekly. In addition, it held itself out as being ready and willing to handle all of the freight tendered. On the other hand, the cases relied upon by the opposing carriers in the arguments before the Commission [2] show that the operating rights sought to be transferred had either not been used in a reasonable period prior to the hearing or had not been used substantially in view of the nature of the area involved and the type of service rendered by competitors.

While considered at first blush, as plaintiffs have put it forward, their claim may appear to have merit, that appearance of merit cannot withstand the record showing and the Commission's finding and conclusion: that the railroad was rendering service on less than carload freight in the considered territory; "has been serving many of the points long before the motor carrier protestants were in existence"; and is under a legal obligation to continue such service.

The only change in the frequency of the service is the rendition of daily service at the points now receiving tri-weekly service. Exhibit 12 shows that the railroad has been handling less than carload traffic continuously between 1925 and the time of the hearings before the Commission. While it is true that the volume of traffic has been steadily decreasing, this factor should not, it does not in law, affect the question of whether or not a new service is being provided. Coupled with this showing is the showing that the railroad maintains substantial facilities at the points under consideration in order to render a less than carload service. The majority of the points proposed to be served have small populations, and it is not unreasonable to assume that they receive no great quantity of carload freight. Thus the facilities at these points can be said to be devoted principally to the handling of less than carload freight.

On this record, we think it is apparent that there is a substantial basis for the Commission's conclusion that the proposal was for an improvement in an existing service and was not a new service, and that, within the teachings of the decisions, particularly of the Parker case, supra, the grant of the certificate was fully sustained. All that has happened here is that the railroad has been losing business because its less than carload service is not, in the time taken, an adequate service, and that what it and the Coordinated carrier are attempting to do is, within the holdings of the applicable authorities, to regain for the railroad, under a certificate strictly limited to auxiliary service, a part of the railroad business which it has been not willingly but unwillingly losing.

On the showing made upon the record as a whole, there is no basis for disturbing the order of the Commission. Accordingly the relief prayed will be denied.

1. "The fact that the Katy Railroad has not heretofore sought authority to perform a coordinated motor-rail service to certain Texas points does not put it in the same category as a certificated motor carrier who has not been operating for a period of years, nor foreclose it from relying now upon proof of operating economies and other benefits which will accrue to it. Applicant must, of course, show that public convenience and necessity require its proposed operations but on that issue evidence of operating economies and efficiencies which may accrue to the railroad is clearly admissible, and we shall consider such evidence along with other probative evidence in the determination of the issues presented."

2. Central New York Freightways, Inc.—Purchase—Gorea's Motor Express, 55 M.C.C. 390; Highway Express, Inc.,—Purchase—Gulf States Motor Express, 55 M.C.C. 491; Watson Bros. Trans. Co., Inc.—Purchase—Powell Bros., 56 M.C.C. 227.